May it please the court, Creighton Magid on behalf of Mieco, L.L.C. This is a case about a contract to deliver gas. It is a contract that doesn't specify a source of the gas, it only specifies the price of the gas and the place of delivery. And the place of delivery that it specifies is one of the 25 most highly traded hubs for natural gas in the United States. So there's plenty of gas available. The seller, Pioneer, is not, as it claims to be in its briefing, merely a producer of gas. As we pointed out, it buys annually 18 trillion BTU, that's 18 million BTU a year from third party sources. It acknowledges that even in the days prior to the events giving rise to this case, it routinely went into the market to purchase gas. It simply made the choice not to buy gas at this point, and why is that? Because the price specified here was a first of the month price, around $3 per MMBTU. Because of the winter storm, the prices had increased, so it saw losses coming its way because it was going to sell gas that it could sell elsewhere, or gas that it would have to purchase elsewhere, as would be in its ordinary course, for much more than the $3. So it made an economic decision not to purchase gas on the market. And it offers this circular explanation. It says, well sure, we're routinely in the market buying gas, but that's only when there isn't an event of force majeure. Well, that doesn't make any sense. A seller of gas, unless the source is specified, cannot simply decide that when the price isn't to its advantage, that it can simply withdraw from the market and stop doing what it has always done, that is buying gas on the market, buying gas on the spot market or from other buyers and sellers in the market, and simply declare force majeure. Counsel, does it matter that your contract with Pioneer lacks the, and I'm quoting, at the delivery point language, since what you just mentioned, present in the other contracts that MECO has entered when it comes to interpreting the phrase seller's gas supply? No, Your Honor. The seller's gas supply is a very separate issue. So let me see if I can break this down into separate things. First of all, the seller's gas supply is an undefined term. And it's a term that, as we said, constitutes what does the seller do in the ordinary course. Where does it get its gas? Now, in a case like the Ergon case, it was undisputed that the gas was from a specific source. Here, we know that Pioneer gets gas from a lot of sources. In fact, it contacted MECO a few days before this and tried to buy gas. So we knew that they were in the market. So it has nothing to do with seller's gas supply. That's really a misnomer. I know Pioneer makes a great deal of that, but it's a double negative provision in 11.3, dealing with gas supply. At a bare minimum, what constitutes Pioneer's gas supply is a fact question that the court, despite this being a summary judgment issue, went ahead and decided. Which is problem one with the district court's decision. Until you know what the gas supply is, how can you then go and answer the rest of the questions? The second thing is, Pioneer says, well, in certain cases, you could add this language. Well, as the record shows, MECO doesn't add that language. That is language that is brought to MECO by other counterparties. And the converse is true. If Pioneer had wished to limit its gas supply to production in the Permian Basin, for example, it certainly could have done that. But it didn't do that. And so you have a case here that is exactly the circumstances in the Hess case. A case decided under New York law, in which the court was very clear. It says, if you don't specify the source, and there are lots of places where you can get the gas, you have an obligation to deliver that gas. It doesn't matter whether your preferred source of supply is unavailable, as long as there is other gas that's available. Let me follow up on Judge Englehart's question about seller's gas supply, and specifically on section 11.3. Is it your view that if Pioneer obtained gas, I don't know if it's even necessary regularly, or just obtained gas from the spot market, that the spot market gas is part of the seller's gas supply? Is that your view? It is, Your Honor. Okay, so I get that. So is that in tension with what we said in the Dynegy case, the Ergon case, I think you just referred to it, in footnote five, where we say, well, that couldn't be the case. Right. And it's not for several reasons, Your Honor. The first thing is, in the Ergon or Dynegy case, I don't know which one to start out with, the court started out and said there was a provision there, the contract there began with the term, seller has certain volumes of gas that are available for sale. And the court said, well, it's clear, it's talked about, you're specifying you've got this gas that you're going to sell. That can't be spot market gas. And so the court in Ergon said, well, given that, that there is a specific source of gas, that it is just the seller's source of gas. With that in mind, was that language in the contract? It was. Okay. Yeah, and. So you're saying that contract is more specific as to what is meant by the universe of gas that is covered by that? Yeah, absolutely, Your Honor. And the court then said, given that, that the implication was that it was the producer's own supply. And therefore, there would be no obligation to go out and buy gas elsewhere. The second point, Your Honor, is that the court in footnote five says, well, it would be ridiculous, particularly in a situation where you have a specific source in mind, to say that you could never have force majeure if there was gas available at any price anywhere in the world. And we're not arguing that if there is gas available at any price anywhere in the world, that you can't have an excuse from performance. But it's a very different circumstance where here, the delivery point is a very highly traded, highly liquid hub. Which means there is plenty of gas to be purchased. There was plenty of gas to be purchased at this time. In fact, all that happened here was an economic shift. Pioneer said we're not going to deliver. Mieko had to go out on the market and buy the gas at that hub. And so it was merely a transfer of economic risk, which was not contemplated by the contract. That's why we call this price majeure and not force majeure. But to further explain that, Your Honor, so in Ergon, the court says, well, you've got to take it to the extreme. And certainly, if you had to go and find the one producer of gas in Kazakhstan, who was holding you up and said, you can't get gas anywhere else, but I might be willing to sell it to you for whatever the unit of currency is. And it's an extraordinary price. That doesn't mean anything. But if you're selling at a hub or at a pool that's highly liquid, where there are lots of transactions during the period of time, that means that it is not impractical to go out and purchase the replacement gas. Which brings me to another point. The district court said, well, prevent, which is language unique to this contract. And keep in mind, and I'd like to go back in a moment and talk about the changes to this contract. But this contract uniquely, and unlike Ergon and unlike the other cases that Pioneer cites, the party specifically agreed that in section 11.1, as modified by the special provisions, that force majeure would only be an event or circumstance that prevented performance, all right? And the district court says, well, prevent doesn't necessarily mean impossible. It can also mean impractical. But then there's no discussion of why is this impractical. If you have all of this gas that is available at a market price, I mean, so you've got lots of buyers and sellers that agree that that is the price. So it isn't- You mean impractical with respect to going on the spot market? Sure. So that, I do have a question about that. It's not so much about the word prevents, but it's about something later in that section, which by the exercise of due diligence, the claiming party is unable to overcome or avoid or cause to be avoided, as further defined in 11.2. I guess the understood object of that is the force majeure event. Right. Are you making an argument that because, I guess, I don't mean to put words in your mouth, so tell me if I am, that if it was not impractical to go on the spot market to get gas, therefore, Pioneer did not exercise due diligence. Is that a part of your argument? It is, Your Honor. Okay, well, if you could help me with that argument. Sure. So the parties specify, and this is language that is unique to this contract. It's not in Ergon, and it's not in the others. Well, there is a due diligence part in Ergon, in one of the contracts. In one of the contracts, yes. But here it says, you've got to exercise due diligence to see if you can overcome the event. So, Pioneer, by sitting on its hands and saying, we declared force majeure, we're under no obligation, it turns that provision on its head. Well, I did not see, and the other side will correct me, certainly, if I'm wrong, that the district court really zeroed in on the due diligence part. It didn't, Your Honor. I mean, there was a passing reference to it in terms of kind of looking at the whole context, but both the issues of whether performance is prevented, rendered impractical or impossible, or whether due diligence was performed. At a bare minimum, that's a fact question, Your Honor. Are you arguing, I'm sure you are, but I just want to get your argument, that the summary judgment record here creates a genuine dispute of fact with respect to the due diligence part? It does, Your Honor. And if you're arguing that, where is the evidence and sort of what's the conflict in the evidence? Sure. So, the evidence here is, you know, we show that this was a widely traded market. We presented evidence in the record set of these days. This is how, you know, there were multiple trades going on. There was lots of gas available, we purchased, so on and so forth. There was really no response from Pioneer. And so our argument is, if you're going to say that, you know, as the district court did, that, you know, just, you know, summary judgment is appropriate because you have no obligation to buy gas, you're skipping over and you're making a fact determination that, that, you know, the due, well, first of all, you're ignoring the language in the contract that says you have to exercise due diligence. And you're ignoring the language in the contract that says you have to prevent performance, but then you're necessarily making a conclusion that due diligence was exercised. It clearly wasn't. Your Honor, and Judge Duncan's questions raise another point here, and that is, this is not just a garden variety NASB contract. There is, the parties specifically included a much more restrictive definition of what constituted force majeure. And in doing that, the requirements are, number one, and this is in the NASB contract, that, that to, to have performance, or non-performance excused, the failure has to be caused by force majeure. So you've got a cause provision, and there is no showing here that, that anything that went on in the Permian Basin caused Pioneer's inability to deliver gas 900 miles away at the Arizona-California border. They could have done what they had always done, and that is buy gas in the spot market. They simply chose to save their own economic hide, not to do it, and that's, that's expressly precluded from being force majeure in section 11.3, Romanette 3. Second, the language that was added through the special provisions says that, that to be force majeure, it has to be, it struck out the definition, any cause not reasonably within the control of the party claiming suspension, and replaced it with two important conditions. One, it has to be an event or circumstance which prevents one party from performing its obligations. We've already talked about that. The district court elided this, but there is absolutely nothing that prevented performance by Pioneer other than it chose not to do so. And then there is the additional provision that says which by the exercise of due diligence the claiming party is unable to overcome or avoid. And again, there's been no showing that, that Pioneer did anything to overcome it. Now Pioneer tries to say, well, we couldn't because this is a winter storm. You, you can't, you know, call up the storm gods and say, call off the storm. But that isn't it. There are two separate provisions here. It says, through the exercise of due diligence, the claiming party is unable to overcome or avoid or cause to be avoided. So it is disjunctive. On the one hand, if you can, you can't claim force majeure if you can avoid the event in the first place. Well, in the, in the section, what does which refer to? I know all of a sudden now we're back in grammar school, but what is the which? I'm in real trouble now. Me too. What's the which? Which by the exercise of due diligence, the claiming party is unable to overcome or avoid. Which refers to what? The, the event or circumstance that prevents the party from performing its obligations. So that would be the antecedent, I believe, Your Honor. Yes, that was good. All right, thank you. All right, good. Tell my, my teachers that I got that one right. And, and then it, it, so then it's got to be an event or circumstance which prevents performance and by, which by the exercise of due diligence, you can't overcome or cause to be avoided. Pioneer only addresses the second part after the disjunctive says, well, you can't solve the storm. And as, as soon as it was over, we did everything possible. We ran around, got the, the plan up and running. But that doesn't address the first part, which is what are you, what are you exercising due diligence or what due diligence did you exercise to enable you to overcome the event? And they did absolutely nothing. They could have bought gas. They had routinely done that in the past. They simply chose not to. And, and in the record, you'll see the questions of, of Pioneer's personnel all get to the question, well, why didn't you? Well, we made the decision to declare force majeure and therefore we weren't interested. We didn't even inquire about the availability of gas. One last point, your honor, as my time's running out on the issue of gas supply. You know, the court says, well, it says seller's gas supply and that somehow implies that it is only the gas that, that Pioneer got from wells in the Permian Basin. Well, there's several reasons why that's wrong. Number one, it doesn't say seller's gas. Now, if it said seller's gas, then it might be okay. We know that that's, you know, the gas that they're getting from their wells. So seller's gas supply, which as we've just pointed out, is at a minimum a fact issue, but, but clearly is something they, they Pioneer buys quite a bit of on the market. Number two, it's just in parallel with the, with the section above it talking about buyer's obligations. So it's, it's, it's not talking about buyer's gas supply. It's talking about the seller. So it's just defining which entity we're talking about. And all of 11.3 in any event is, is really just saying, in the ordinary course, the loss of gas supply cannot be an event of force majeure, but read in conjunction with 11.2, it may be, but not as the district court read it, which says, therefore, it must be an event of force majeure. All right, sir, we have the opening argument. Bruce, there's a lot of time. Thank you, your honors. Here from Mr. Pace. Good morning, your honor. May it please the court. My name is Christopher Pace. I'm here representing Pioneer Natural Resources. Pioneer Natural Resources is a oil and natural gas exploration and production company. Mieko is a California-based energy trading firm. These, the parties entered a very clear agreement that required Pioneer to deliver a certain quantity of gas to a certain location out in Cal, near the California-Arizona border. We just enjoy when lawyers tell us things are very clear. As, as my, my 20 minutes progress, your honor, that may change. But it does clearly, it does require Pioneer to provide a certain volume of gas without exception, unless there's a force majeure event. So in other words, when Pioneer is delivering gas, it has its own gas supply. If for some reason that gas supply is not sufficient, and there is no force majeure event, yes, Pioneer has to discover, has to resolve that issue. And it may require it to go out and buy other gas. It may require it to go to the customers, the record reflects here, and essentially buy back the amount of gas. In other words, we said we'd get you 20,000, we can only get you 18,000, we will pay you for the 2,000 gap. But once a force majeure event arises, that's what allows Pioneer to not have to comply with, or to not have to fill, follow through on those obligations. The agreement here, section 11.2, 11.3b, identifies a force majeure event to include a loss or failure of Pioneer's gas supply, the seller's gas supply, due to a weather related event infecting the entire geographic region. This is a narrow provision. This does not give Pioneer an ongoing regular right to be able to escape production. This is a very narrow set of circumstances. Winter Storm Uri was precisely such an event, however, and the record, of course, is undisputed that the Winter Storm Uri had a devastating effect on the ability to obtain gas out of Texas, all of Pioneer's wells, the processing facility, were all in the Permian Basin in West Texas.  The force majeure provision for loss or failure of a seller's gas supply due to a winter storm event affecting the entire region fits this case perfectly. Counselor, what's your best case, your best New York law case that we should look at in order to determine the meaning of the word prevent in the force majeure context? Or is there one? Well, I would have to cite, your honor, to Cal-Chem versus Central Markets. That's 70 New York Second, 900. Though I do believe in this context, to be perfectly honest, your honor, the cases that are dealing with force majeure provisions in the context of natural gas and oil production are just simply more instructive because they deal with these particular issues. And you say that cases that are non-New York law cases, you're saying, are more instructive. I am, your honor. I mean, there are two that are New York cases or that apply New York law. One is the Hess case, which is actually from New Jersey. One is a Northern District of New York case applying New York law, all of which are addressed at different points in our brief. I do want to be clear here, though, in terms of what Mieko's position is and what their argument is and the effect of what that argument is. Which is, they're claiming that if Pioneer could acquire gas from some third party, unknown third party, unidentified third party in the contract, and have that gas delivered to a location near the Arizona-California border, then it has no right to declare force majeure, notwithstanding the very express reference in the agreement to the seller's gas supply. Clearly, that gas supply is unknown in the sense of the party involved is not known. It's a spot gas. It's actually, believe it or not, an anonymous transaction initially. You buy it and then you find out afterwards who's on the other side. That still brings us back to the word prevent, and how is that not a fact question of how prevented your client is from supplying from whatever source? Well, a couple of reasons there, Your Honor. Three, actually. First is, there was no dispute in the district court in terms of what the difference was over the issue of replacement gas, of whether we had to acquire replacement gas or not. And the courts, including this court in Ergon, was very clear that if your gas supply is, I'm sorry, that one thing you don't have to do in order to perform is to go out and buy replacement gas. And in fact, the language there is fairly similar in terms of renders unable. Your Honor, I want you to give a full answer to Judge Engelhardt, but I just need to stop you there because this is where my difficulty is. As I read the Ergon Dynegy case, and I'm thinking specifically about the part of the case about the Ergon WV contract, which does have this language of exercise of due diligence in it. So it's reminiscent of this contract. And I just want to get your reaction to this. As I read our Dynegy opinion, we said, look, that provision, whether it requires getting replacement gas, is ambiguous. I think that's what we held in this case. And then we said, all right, so we need to look at the evidence. And in that particular case, all the evidence seemed to go to one side and say, nope, no obligation to get replacement gas. But it was an evidentiary issue. So is that inconsistent with what the district court did here? Meaning, I don't see a lot of discussion about the due diligence clause. I don't see discussion about, is there an evidentiary issue about whether this meant that you could exercise due diligence, go on the spot market, get replacement gas? Is there tension between those two cases? I don't believe so. But let me see if I can reconcile it in two different paths. One path is to say, just to be clear, the Ergon agreement did not have the clear reference that we have to the seller's gas supply. There is a, I think, a weird- Well, let's assume I agree with you. Just assume, arguendo, that I agree with you that seller's gas supply means, sorry, the stuff you get from Targa, right? I know that's not, I wouldn't go far in this industry. But the stuff you get from Targa, let's assume it means that. Yes, your honor. If it does, then the issue of overcoming the event, there is no factual dispute here in terms of overcoming or avoiding the event, which is the winter storm URI. Well, overcome or avoid or cause to be avoided, I mean, why wouldn't the argument be, well, the one way you overcome the event is you go get replacement gas. But in that case, your honor, you're not overcoming the event, correct? I mean, I believe what's happening is, what you may be saying is, you're getting gas to somebody else and that you don't have. But that doesn't overcome or avoid the event. Now, normally in cases where this could apply is a pipeline is broken, a certain supplier has some challenges or a certain intermediary has some challenges. I mean, winter storm URI is quite a unique event. They'll make it easier. They'll make it just a broken pipe. Right, and it could be the, can you fix the pipe? Can you use a different pipeline to get it? You know, a lot of these pipelines are interconnected. Now, HESS is a transportation case, right? As opposed to a supply case. But let me use this as an example, right? Footnote seven or eight, and I'm forgetting which one. I think it's eight. Where the court acknowledges the defendant there could, the pipeline that went to the relevant delivery point was called the Tennessee 500. And the court there says, you had gas on other pipelines that you could get to the Tennessee 500. So the main pipeline from the case, the one you usually used, was affected by, I believe it was Hurricane Katrina. I might have the wrong hurricane. But it was affected by a hurricane. But you had other pipelines feeding into it. And you had sufficient supply to feed into it. And that's what you had to do. So when it comes to a winter storm event, there's really, challenging to overcome or avoid, certainly avoid. I don't believe that there's really a way of avoiding a winter storm event. Again, maybe in some circumstances, if you're transporting gas or a substance physically, right, making sure your trucks aren't all stuck in Texas. But again, the focus is very clearly on the event. And as I said also, there's, from the language in Ergon, I think is much further removed in the sense of not identifying the seller's gas supply. But I also have a second answer, or a second response, which is, and the record here also was very clear. There was no dispute. The only issue that Mieko raised is this kind of going to the spot market. There is no argument that there's something else Pioneer didn't do. Now, they may want to say that Pioneer sat on their hands. I can guarantee this court, that the hardworking folks at Pioneer were not sitting on their hands during winter storm Yuri. I guarantee you that there was a lot of sleepless nights, that there was a lot of efforts to get those pipelines back up and running again. And there was no one who was going home early during that time. I think there's some folks were working from home. I'm not quite sure when all the pandemic related restrictions came into effect. But they were working very diligently. And in fact, they got the gas supply back up and running very quickly by February 20th, for the most part. There were still challenges that they were facing. I do want to address, because I think that it was not referenced earlier, really the strength of the cases. In your case, if you were shut down, just completely dysfunctional, because of Yuri, force majeure. Here, they seem to argue, well, you weren't shut down completely, you know, getting back into preventable means. They ended up buying gas from the spot market that you could have bought it from. Economically, they don't seem to argue that that's, quote, the seller's gas. They don't make that argument. But they do seem to say force majeure really doesn't kick in here until you're sort of exhausted. You're not shut down. Therefore, you're able to navigate within the market. And that's what they argue, I think, that force majeure really isn't operating. Let me be clear, and I don't want to misinterpret your question. But both our experts and their expert all agreed that the Permian Basin was shut down. So when we talk about being shut down, were people able to work from their homes? Were they able to access the telephones? Absolutely. I mean, I'm not doubting that. They were working 24-7. There is no dispute that the gas that Pioneer owns and controls in West Texas, they were not able to get to that gas through the wells freezing, the processing plant having the problems they had and everything. The only issue would be, could you go to this spot market in Arizona, California and acquire gas? And even then, it's a step more complicated than that because their position is that can you get gas to that spot market? There's some ability in the natural gas industry to divert gas away. So in other words, even if I didn't intend to send it to the border today, I was intending to send it somewhere else, I might be able to divert it there. That they're also trying to include. In all cases, none of this is gas that was owned by Pioneer, gas that was controlled by Pioneer. And it really dramatically changes the contractual language because you could quite simply put in there, unless you're unable to get gas at the delivery point. In fact, as we note in our brief, that's exactly what Mieko has done in some other contexts. They have put in there that says, you can't declare force majeure unless you cannot get gas at the delivery point. Very easy fix. In fact, the parties can always contract around some of these issues. Here, however, there was no such provision as that. And there is a very clear provision that goes directly to our issue. It says, the loss of the seller's gas supply or depletion of their reserve. And there was no dispute in this case, in the record before the court, that there was really only two options that were presented to the judge. One was, seller's gas supply means the gas that Pioneer owns and controls. And then two is, it means that plus any gas that might be available on what's called the to the Arizona-California border. That was a clear dichotomy that the court was presented with. And that's a clear dichotomy that the court resolved. It's kind of a curious question as I look at this. Failure of seller's gas supply or depletion of reserves. What is the difference between supply and reserves in that sentence? The reserves is certainly what you still have in the ground. And the supply is what you've actually already pulled out. So, you know, your reserves are what you're kind of holding on to. You can bring up eventually. The supply is what you've already brought up. But they are both clearly, Your Honor, to the extent this is the point you may be reaching or getting towards, is related to the seller. Yeah, that was my next question. Does sellers modify both supply and reserves? Correct. No one would imagine that the reserves being in that phrase means worldwide reserves. Right? Until we obviously run out of gas in the world. And I do want to make a reference on that worldwide because I want to be clear when we talk about Ergon, too. While it's a slightly colorful phrase, I think it's very clear that Ergon Court, which makes reference immediately in the sentence preceding it to a spot market, understood the dynamics of how the market worked. I think the reference to anywhere in the world really means anywhere in the world that you could have gotten to that spot market. It's literally right there in the same footnote. And the same thing, I think, here with Judge Boyle. I mean, everyone understands that if there happens to be gas in a fuel truck in Tokyo, no one is saying that that means you can't declare force majeure. But no court is thinking that way. But it is true that these spot markets are pretty dynamic. And so when someone says, if you could get gas to this location, it's not so simple to know exactly what that means. You don't sit there, it's not like walking into a grocery store and you kind of say, oh, there's five bottles of Coke on a countertop, I can buy five, that's the limit. It's an ever-evolving, ever-changing number. And again, I think very consistent, in fact, with the very notion of a seller's gas supply, to have this constantly evolving number. The phrase itself, I want to take it from a second perspective too, which is why is this kind of an intelligent way for the parties to align their interests? It is pioneers taking the risk on those other than when a force majeure event arises. They've got to get the gas to you. They do that predominantly, almost exclusively, by using their own gas. You can talk about the volume that is purchased from other sources, but the fact of the matter is, that's because the total volume is so much, right? In other words, we're only talking about 12%. In fact, it's often lower. Sorry, where does the 12% come in? That's what, so in the record, there is that of the gas that Pioneer sells, 88% comes from its production wells, and 12% is what's spot market. Even that's a little bit, that's an inflated number from the sense that, remember I told you the example with Mieko here in the record, where they'll buy back. If I can't get you 20,000, but only 18,000, I'll just pay you for the 2,000, the additional 2,000. That's most of what that is. It's not anonymous spot market purchases. But my point is, for the parties to arrange their interests, to align their interests, okay, Pioneer's always going to seek to satisfy its obligations using the own gas that it produces. There may be a deficiency here and there, there may be a shortfall, and then they have to satisfy that outside the force majeure context. They've got to find a solution. But in the force majeure context that takes out the lion's share of that production, that the source that Pioneer always turns to, that fundamentally changes the dynamics of the relationship. This is not, and there's no evidence in the record because it's simply not the case, that these parties, sometimes you got all your gas from X, sometimes you got all your gas from Y, and sometimes you got, it's just the stuff you produced yourself. No, in fact, what happened was Pioneer used its source of gas, its gas supply on an ongoing basis. And if there was, for some reason, a gap, a deficiency, a shortfall, and not a force majeure event, they would fill that gap. Wouldn't satisfy it entirely. Clearly, what Mieko was seeking here is to say, you can't get your gas, you go out and buy 100% of that gas on the spot market to satisfy the requirements. I want to, before sitting down, I had mentioned two cases from the New York law. I want to talk about those very briefly, if I can. One is the Hess case. And as I said, the facts in the Hess case, it really is a transportation case about a, you know, cutting off a pipeline transportation source. There, the record is very clear. It's note seven, so I did get it wrong, instead of note eight. That the defendant had the required gas. And so when the court says you can get, you can provide them gas from your own source or from the spot market, that's just the court saying, look, your transportation isn't an excuse not to perform. But certainly, Hess is never saying that, doesn't interpret seller's gas supply, and makes no claim that if a defendant had no gas from its own supply, it would have to go out and acquire it all from the spot market. I also want to mention J.P. Morgan, which is the other case, it's a New York law case. In that one, it's the electrical supplier. But that contract says if the seller's supply is unavailable, they, there's no force majeure exception. So it says you can't declare force majeure if your supply is unavailable. But I'll say what the J.P. Morgan court interprets the supply there, it's a wind farm case, is the electricity generated by the wind farm. So in other words, they do the exact same thing we would do. It's just that ours, their contract says, full stop, you can't use seller's supply, or seller's supply is not an excuse. Our case says, except enforce majeure. I appreciate the time, your honors. All right, thank you, counsel. All right, back to you, counsel, for a vote. I'd like to begin with the two New York law cases. First, Hess. Sure, there was a, the case there was the pipe didn't work. Doesn't make any difference whether it's the pipe or the well or whatever. The point of Hess was that if, and it was very clear, if you don't specify in either the special provisions or in the transaction confirmations itself, either a particular route of transportation or the source, then you are obligated to deliver that gas. It is a delivery contract, exactly what we have here. It is a delivery contract. If, if Pioneer had intended it to be a sourcing contract, to say we're going to sell you gas from our wells, or as in Ergon, if there is a preface that says, we have a certain amount of gas that we have, that we're going to sell you, then that's a very different circumstance. But here, where it is unspecified, Hess provides the answer. It doesn't matter whether the problem is with the pipe or anything else. What Hess said was, sure the pipe was broken, but your delivery obligation was at a well or a hub that was fed by a number of different sources. So the fact that you couldn't get your preferred source of gas there through the pipeline is irrelevant. Your obligation was to deliver gas at the hub, unspecified gas molecules that were not otherwise distinguishable, and you had an obligation to do that. And you could do that because you could purchase gas there on the spot market, and therefore it is not force majeure. Similarly, in the Miami Wind case, the court had two provisions. And yes, it's true that one of the provisions, or the reasons for the opinion there were, the contract language there expressly said, failure of supply is not a force majeure event. But then the court went on to say, this was electricity, and there was plenty of electricity available, for that reason as well, the wind farm, even though everybody knew that the wind farm was intending to sell the wind farm's output, said, no, sorry, you've got to go and you can't declare force majeure because you didn't say electricity from our wind farm, you said we're going to deliver electricity at the ERCOT hub, and you had an obligation to do it, and you could do it because there was electricity there that you could have purchased and delivered. So the two cases that decide New York law are very clearly in our favor, and they were really brushed over by the district court. As a matter of fact, the district court tried to distinguish the Hess case by saying, oh, but it has different language involving gas supply. Simply not true. As we pointed out in our motion for reconsideration, the language is exactly the same. So that's not a basis for distinguishing it. The council also tried to tell the court that, well, overcome the events or circumstance means, as I had predicted, that you had to cause the storm to go away. That's not it. The language is overcoming your failure to deliver. And absolutely, I don't know what these people were doing, how busy they were. I'm not suggesting that they're just loafing at Pioneer, but they acknowledge that they did absolutely nothing when it came to looking for alternative sources of supply. If we were to conclude, not that we have, but that there are some fact issues here, what would the quality of that evidence look like? The evidence would, first of all, in terms of gas supply, would show that Pioneer, day in and day out, purchased gas to supplement other production. Number two, that it didn't actually own the gas that it now claims that it owns. As Pioneer acknowledges in its brief to this court, it essentially sells its production to Targa, and then as the sale price for that, it gets some gas back from the Targa plants. And in addition to that, because it has an ownership interest in Targa, it gets gas from somebody else's wells. So this canard that it's only a production company selling its own production, simply isn't true, as a matter of fact. Third, there's no evidence in the record at this point that, in fact, Winter Storm Uri prevented the Targa plants from delivering gas. The only evidence is some expert who says, that's my understanding, but the first party witnesses don't say a thing about it. And we have evidence showing that, again, we're not arguing that you have to buy gas somewhere with a pipeline connecting to the California border. We're saying, at that point, so you don't have to transport anything, we have shown in quantities, day by day, how much gas was available, how much could have been purchased, what the cost of that was, the fact that we purchased it. And again, the issue is simply, Pioneer chose to declare force majeure and then said, well, the game changes. Ordinarily, as you just heard, we go out and buy gas, but now we're going to claim it's too expensive, we're not going to do it, and it's up to you to pay it. That isn't what the contract said, Your Honors. All right. All right. Thank you very much. Thank you, Counsel. You're briefing in arguments in the case. The case will be submitted.